UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PAREXEL INTERNATIONAL LLC, | * |
| Plaintiff, | * |
| v. | * Civil Action No. 23-cv-12381-ADB |
| PRISYMID LIMITED and LOFTWARE, INC., | * |
| Defendants. | * |

# MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Parexel International LLC ("Parexel") brings claims against Defendants PrisymID Limited ("PrisymID") and Loftware, Inc. ("Loftware," and, collectively, "Defendants") relating to a promise, and subsequent failure to provide, label printing services. [Compl. at 1].[1] Specifically, Parexel asserts breach of contract against PrisymID and Loftware (Count I), [Compl. ¶¶ 33–38]; fraud in the inducement against PrisymID (Count II), [id. ¶¶ 39–45]; and violation of Massachusetts General Laws ch. 93A against PrisymID and Loftware (Count III), [id. ¶¶ 46–53]. Before the Court is Defendants' motion to dismiss the entire

---

[1] This case was removed to this Court on October 13, 2023, [ECF No. 1], and the state court record was filed on October 18, 2023, [ECF No. 10]. The Complaint appears at ECF No. 10 pages 3–10. The Court will refer to this portion of ECF No. 10 as the "Complaint" or "Compl."

Complaint as to Loftware, and Counts II and III as to PrisymID. [ECF No. 16]. For the reasons set forth below, the motion is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>.

## I. BACKGROUND

The following facts are drawn from the Complaint, the well-pleaded allegations of which are taken as true for purposes of evaluating the motion to dismiss. See <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).[2]

### A. Factual Background

#### 1. The Parties and Their Agreement

Parexel is "among the world's largest clinical research organizations," and one of its services "is the printing of labels for the drugs that are used in clinical trials." [Compl. ¶ 5]. In the world of clinical trials, "it is essential that drug labels be 100% accurate and legible." [Id. ¶ 6].

"Parexel presently outsources its label printing to vendors that both print the labels Parexel uses and inspects them to ensure that the labels contain no printing errors." [Compl. ¶ 10]. Because the vendors have "sophisticated systems that allow them to electronically inspect labels to find and correct any errors[,] Parexel does very limited manual inspection of these labels to ensure quality." [Id.]. "During a typical month, Parexel generates roughly 14,000 labels[, and t]he manual inspection of all of these labels would be, as a practical matter, exorbitantly time consuming, burdensome and costly for Parexel to accomplish." [Id. ¶ 17].

---

[2] Parexel attaches several documents to its opposition, [ECF Nos. 22-1–22-7], which are not included in the Complaint and that Defendants claim are "unauthenticated, disputed, and immaterial," [ECF No. 29 at 1]. The Court does not consider these documents for purposes of this order. See <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993) ("[o]rdinarily, . . . any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden[] unless the proceeding is properly converted into one for summary judgement").

On December 12, 2017, Parexel and PrisymID entered into a Master Software License and Services Agreement (the "MSA") relating to label printing services. [Compl. ¶¶ 7, 9]. About a week later, on December 20, 2017, they entered a Statement of Work (the "SOW") pursuant to the terms of the MSA, [id. ¶ 8].[3]

In the SOW, PrisymID "agreed to deliver 'a world-class global labeling system' for Parexel, which it called PRISYM360." [Compl. ¶ 9]. Specifically, PrisymID "promised to deliver" a software solution that would "allow Parexel to print labels itself on an as-needed basis rather than hiring outside vendors to do the printing and quality assurance." [Id. ¶ 11]. It further promised in the SOW to

> "[insource] the Production printing of single panel labels and booklet overprinting to reduce label outsourcing costs and lead times" and "[f]acilitate the replacement of the existing manual processes around creation of Master Label Texts and Country Label Texts."

[Id. ¶ 12 (alterations in Complaint)].

One of the "crucial component[s]" of PRISYM360 was "called 'Vision automated label inspection'" ("Vision"), which PrisymID promised would provide "'[i]mpressive and simplified inspection masking tools [and] [would] remove the requirement for in-house vision experts or consultants.'" [Compl. ¶ 13 (first and third alterations in Complaint)]. PrisymID further represented that Vision was "'automated' such that [it] would find any label that contained errors," and that Parexel would "only have to manually remove the labels that Vision identified as containing errors in order to ensure no drugs were shipped with faulty labels." [Id. ¶ 14].

Approximately sixth months after entering the MSA and SOW, on June 29, 2018, PrisymID sent Parexel "a signed Functional Specification," which "defined the functionality to

---

[3] As discussed further below, Loftware acquired PrisymID in January 2022. [Compl. ¶ 19].

3

be included in PRISYM360, and 'expressly promised Parexel that one of the benefits of its PRISYM360 system would be "100% automated inspection of printed single panel labels."'" [Compl. ¶ 15].

### 2. The Product Does Not Work as Promised

When Parexel tested Vision, it "did not work as [Prisym]ID promised." [Compl. ¶ 16]. Rather, "[a] substantial number of labels that contained printing errors were . . . not recognized as containing errors." [Id.]. Thus, in contrast to the "'100% automated inspection'" that had been promised, Parexel had to "manually re-inspect **every label** during the testing process to ensure that there were no errors that Vision had not caught." [Id. (emphasis in brief)].

Parexel immediately informed PrisymID of the failure, which then made many unsuccessful attempts to fix the problem. [Compl. ¶ 18].[4] The parties continued to test and try to fix PRISYM360 and Vision from 2018 through 2021, but without success. [Id. ¶¶ 19–23]. Loftware purchased PrisymID in 2022, and the problems continued after that time as well. [Id.].

### 3. The Breach Notification and Aftermath

In April 2022, more than four years after entering the MSA and SOW, Parexel "issued a Notice of Material Breach to PrisymID due to the repeated failure to deliver the promised system." [Compl. ¶ 24]. Counsel for Loftware responded "on behalf of Lof[t]ware and PrisymID jointly," and discussions between the parties began. [Id. ¶ 25].

---

[4] "As it turned out, [Prisym]ID had purchased the Vision hardware components and software ('PrintInspector') of PRISYM360 from another company called Crest and had not developed the hardware itself." [Compl. ¶ 18]. "[Prisym]ID called in Crest and made many unsuccessful attempts to fix the problem as the printing system continued to be tested prior to implementation." [Id.]. Crest continued to help to try and fix the problems until April 2022. [Id. ¶ 23–24].

4

"Thereafter, Loftware [and] PRISYMID informed Parexel that it had made improvements to the system and asked for yet another chance to make the product work." [Compl. ¶ 27]. Parexel agreed to test the product again, and did so over a two-week period in October 2022, with representatives from Loftware, PrisymID, and Crest, but it still produced multiple defective labels "that were not detected by the Vision system" and only found through manual inspection. [Id. ¶ 28]. A representative from Loftware then told Parexel that "nothing could be done to ensure the system would consistently detect all labels with errors." [Id.].

"Having an internal label printing system that cannot guarantee that the drug labels Parexel prints are error free is, to put it simply, not the agreement Parexel entered into with [Prisym]ID." [Compl. ¶ 29]. The flawed system exposes Parexel to liability and patients to several risks, [id.], and would "require Parexel to manually check every label, which would add enormously to Parexel's burden and expense," [id. ¶ 30]. Accordingly, Parexel asked for its money back, but Defendants refused. [Id. ¶¶ 31–32].

### B.  Procedural History

Parexel filed the Complaint on September 8, 2023. [Compl. at 1]. After the case was removed from state court to this Court, [ECF No. 1], Defendants filed their motion to dismiss on October 27, 2023. [ECF No. 16]. Parexel opposed on November 9, 2023, [ECF No. 22], and Defendants replied on November 27, 2023, [ECF No. 29].

## II.  STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court

may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

## III.  DISCUSSION

### A.  Count I: Breach of Contract

Defendants move to dismiss Count I as to Loftware only.  [ECF No. 17 at 12].  To state a claim for breach of contract in Massachusetts, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  Where, as here, Loftware is not a party to the MSA, see [Compl. ¶ 7; ECF No. 22 at 6], it can only be liable for breaching the MSA in the following circumstances:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968).  Put another way,

> [w]here there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses, records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity.

Id. (internal citation omitted).

There is a "presumption of corporate separateness," and that presumption "may be overcome only 'in rare particular situations in order to prevent gross inequity.'" Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 128 (1st Cir. 2006) (quoting My Bread Breaking Co., 233 N.E.2d at 752).  Factors to be considered when assessing "the actual nature of the corporate interrelationship" include:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Id. (quoting Att'y Gen. v. M.C.K., Inc., 736 N.E.2d 373, 380 n.19 (2000)).

Here, the only facts in the Complaint that speak to the relationship between Loftware and PrisymID are that "Loftware acquired [Prisym]ID in January of 2022," [Compl. ¶ 19], and that,

7

in general, Loftware and its counsel began communicating with Parexel regarding performance under the MSA after the acquisition, [id. ¶¶ 25–31; ECF No. 22 at 6].  These allegations are not enough to meet the demanding requirements for piercing the corporate veil.  See My Bread Baking Co., 233 N.E.2d at 752 ("common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees"); see also Abdallah v. Bain Capital LLC, 752 F.3d 114, 121 (1st Cir. 2014) ("allegations that a parent directs or controls particular actions by a subsidiary are generally not enough to render the parent liable for all torts related to those actions"); Platten, 437 F.3d at 124, 128–29 (that an executive of a parent "sometimes act[s] on behalf of the P[arent] and other times on behalf of its subsidiaries 'is to be expected when individuals serve as directors for both a parent and its subsidiary,'" and is not a "circumstance[] . . . [that] lead[s] to an inference of[] any gross inequity that would argue in favor of overriding the presumption of corporate separateness.").  For example, the Complaint says nothing about (1) the nature of the acquisition, including the structural relationship between the two entities and to what extent Loftware controls PrisymID; and/or (2) how their businesses, records, and finances are organized and whether and to what extent they are intertwined.  See generally [Compl.].  Accordingly, the motion to dismiss Count I as to Loftware is granted, the claim is dismissed without prejudice, and Parexel is granted leave to file an amended complaint.

   **B.**  **Count II: Fraud in the Inducement**

Count II, brought against PrisymID only, is for fraud in the inducement.  [Compl. ¶¶ 39–45].  Specifically, Parexel alleges that PrisymID's representation "that it could deliver [a] 100% automated system that would detect any errors in printed drug labels" was both material and

false, and made "with the intent to entice Parexel to purchase its PRISYM360 system." [Id. ¶¶ 40–42].

To state a claim for fraudulent inducement, Parexel "must establish that: '(1) the statement was knowingly false, (2) defendants made the statement with the intent to deceive, (3) the statement was material, (4) plaintiff reasonably relied on the statement, and (5) plaintiff was injured as a result of its reliance.'" Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 310 (1st Cir. 2022) (quoting United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 199 (D. Mass. 2004)); see also Nash v. Tr. of B.U., 946 F.2d 960, 962–63 (1st Cir. 1991) (plaintiff must "establish a false representation material to the negotiations, upon which [it] reasonably relied in entering into the agreement."); Wollaston Indust., LLC v. Ciccone, No. 19-cv-10678, 2019 WL 6841987, at *2 (D. Mass. Dec. 16, 2019) (same); Singh v. Singh, 50 N.E.3d 219 (Table), 2016 WL 2771964, at *2 (Mass. App. Ct. May 13, 2016) ("To establish fraud in the inducement, and thereby be relieved of the effect of [the agreement, the defendant] was required to establish the elements of common deceit, . . . which include misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." (internal quotations and citations omitted))). "A claim of fraud must also satisfy the particularity requirements set forth in Fed. R. Civ. P. 9(b), mandating 'specifics about the time, place, and content of the alleged false representations.'" Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 358 (1st Cir. 2013) (quoting Juárez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 279–80 (1st Cir. 2013)). Put another way, a plaintiff must "specify the who, what, where, and when of the allegedly false or fraudulent representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

Defendants first argue that the representation regarding a 100% automated and accurate system was made "*within* the [MSA] and is incorporated therein; not *before* the [MSA] was made." [ECF No. 17 at 7 (emphasis in brief)]. Thus, Defendants aver, Parexel "fails to allege with the requisite particularity any misrepresentation of fact made by PrisymID that could have *induced* [Parexel] to enter into the [MSA]." [Id. (emphasis in brief)]. Defendants therefore contend that the dispute is about the interpretation of the contract, and should be resolved as part of the breach of contract claim. [Id.]. Second, Defendants state that any additional purported misrepresentations, for example in the SOW regarding a "world-class global labeling system" are too vague to support a fraud claim. [Id. at 7–8].

In response, Parexel argues, among other things, that the Complaint contains "detailed explanation[s]" of promises made that are not "quote[d] from the written contract, . . . [or] reference[d in] the written contract," [ECF No. 22 at 8 (citing Compl. ¶¶ 9, 14)], including that

> [t]he software solution PRISYMID promised to deliver was intended to allow Parexel to print labels itself on a[n] as-needed basis rather than hiring outside vendors to do the printing and quality assurance. PRISYMID promised Parexel that PRISYM360 would give Parexel the flexibility to print labels as it needed them so that the time and expense of having to contract with an outside vendor to print bulk quantities of labels, inspect them for errors, and deliver them to whatever part of the world Parexel needed them could be eliminated.

[Id. at 7–8 (quoting Compl. ¶ 11)].

As an initial matter, the Court does not have the MSA before it, and thus cannot assess Defendants' arguments about what language is or is not in the contract itself. See, e.g., [ECF No. 17 at 7]. In any event, "the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it," McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.Ed.2d 188, 194 (Mass. 1990) (quoting Bates v. Southgate, 31 N.E.2d 551, 558 (Mass. 1941)), and "a party should not be permitted to engage in fraud to induce the

10

contract," id.  Here, interpreting the Complaint in the light most favorable to Parexel, Hutcheson, 647 F.3d at 383, Parexel has alleged, for example, that (1) "PrisymID represented to Parexel that Vision would be 'automated' such that Vision would find any label that contained errors," [Compl. ¶ 14]; (2) PrisymID knew when it entered the MSA that the PRISYM360 software, which included Vision, [id. ¶ 13], "could not detect all printing errors and had no reasonable chance of being able to do so in the foreseeable future," [id. ¶ 41]; (3) Parexel viewed the accuracy PRISYM360 as a "crucial component" of the services to be provided and that PrisymID used it to "entice" Parexel to enter the MSA, [id. ¶¶ 13, 42–43]; (4) but for the misrepresentations regarding PRISYM360 and Vision, it would not have entered the MSA, [id. ¶ 44]; and (5) without the promised accuracy, Parexel faced liability and "enormous[] . . . burden and expense," [id. ¶¶ 29–30].  This is enough to state a claim, and accordingly Defendants' motion to dismiss Count II is denied.

### C. Count III: Chapter 93A

Parexel alleges in Count III that PrisymID violated Mass. Gen. Laws ch. 93A by misrepresenting the accuracy of the PRISYM360 system with the intent of deceiving Parexel into purchasing it, [Compl. ¶¶ 48–50], and that Loftware violated 93A by "unfairly and deceptively . . . den[ying] that [Prisym]ID had ever promised Parexel that the Vision system would be automatic and not generate false positives," [id. ¶ 51].

Under 93A "the unfair or deceptive conduct must 'occur primarily and substantially within [Massachusetts]' to be actionable." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 57, 52 (1st Cir. 1998) (quoting Mass. Gen. Laws ch. 93A, § 11).  Conduct occurs "primarily and substantially" within Massachusetts when "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Sonoran Scanners,

11

Inc. v. PerkinElmer, Inc., 585 F.3d 535, 546 (1st Cir. 2009) (quoting Kuwaiti Danish Comput. Co. v. Digital Equip. Corp., 781 N.E.2d 787, 799 (Mass. 2003)). "The center of gravity inquiry examines the actionable conduct as opposed to conduct that is neither unfair nor deceptive." Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc., No. 13-cv-11302, 2014 WL 1203106, at *8 (D. Mass. Mar. 19, 2014). Determining whether the conduct at issue occurred primarily and substantially within Massachusetts is "fact-intensive," Evergreen Partnering Grp., Inc. v. Pactiv Corp., No. 11-cv-10807, 2014 WL 304070, at *5 (D. Mass. Jan. 28, 2014), but is nevertheless "a question of law," In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009).

The center of gravity analysis is not based on a formula "identified by any particular factor or factors" because a significant factor that exists in one case may not exist in another. Kuwaiti, 781 N.E.2d at 798–99. That said, courts may consider "where the defendant committed the deceptive acts and practices," "where the plaintiff received and acted upon the deceptive or unfair statements," and "the situs of the plaintiff's losses due to the unfair or deceptive acts or practices." Reicher v. Berkshire Life Ins. Co. of Am., No. 02-cv-10868, 2002 WL 31426758, at *2 (D. Mass. Oct. 29, 2002) (quoting Arthur D. Little, 928 F. Supp. at 1208), aff'd, 360 F.3d 1 (1st Cir. 2004). "[A]ttempts, however, to single out particular factors that might control the functional inquiry and then to place these factors in some order of importance, are necessarily not fully satisfactory." Kuwaiti, 781 N.E.2d at 799 (quoting Sonesta Int'l Hotels Corp. v. Cent. Fla. Invs., Inc., 712 N.E.2d 607, 611 (Mass. App. Ct. 1999)). Accordingly, courts differ as to which factor should carry the most weight in the analysis. Compare, e.g., Reicher, 2002 WL 31426758, at *2 (noting that the location of recipient of deception at time of reliance is "of particular import"), with Spring Investor Servs., Inc. v. Carrington Cap. Mgmt., LLC, No. 10-cv-

10166, 2013 WL 1703890, at *12 (D. Mass. Apr. 18, 2013) (explaining that the inquiry focuses on "conduct said to give rise to the violation; other conduct . . . may not be considered on the question"). "In all events, however, the focus of the inquiry should be on 'the purpose and scope' of Chapter 93A." In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d at 194 (quoting Kuwaiti, 781 N.E.2d at 799).

Here, the only allegation in the Complaint that ties this case to Massachusetts is that Parexel is headquartered in the state. [Compl. ¶ 1]. Even drawing all inferences in Parexel's favor, and crediting Defendants' argument that "much of the business dealings between [Parexel] and PrisymID" discussed in the Complaint "occurred in Europe; not Massachusetts," [ECF No. 17 at 11–12 (citing [Compl. ¶¶ 2, 28])], Parexel's allegations are not enough for the Court to find that "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within [Massachusetts]." Sonoran Scanners, 585 F.3d at 546 (quoting Kuwaiti, 781 N.E.2d at 799). Accordingly, Count III is dismissed without prejudice, and Parexel is granted leave to file an amended complaint.

## IV.  CONCLUSION

Accordingly, Defendant's motion to dismiss, [ECF No. 16], is GRANTED IN PART and DENIED IN PART. It is granted with respect to Count I, which is dismissed without prejudice as to Loftware, and Count III, which is dismissed without prejudice in its entirety. Plaintiff is granted leave to file an amended complaint as to both Counts. The motion is denied as to Count II.

SO ORDERED.

July 19, 2024                                              /s/ Allison D. Burroughs
                                                                          ALLISON D. BURROUGHS
                                                                          U.S. DISTRICT JUDGE